# In the United States Court of Federal Claims

No.  09-750C

(Filed: September 17, 2010)

| | |
|---|---|
| INFINITI INFORMATION SOLUTIONS, LLC, )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES, )<br><br>Defendant. ) | Post-trial request for attorneys' fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412(d); prevailing plaintiff; lack of substantial justification for the government's posture in the case; fees; expenses; costs |

Janine S. Benton, Benton, Potter & Murdock, P.C., Falls Church, VA, for plaintiff.  With her on the briefs was Kathy C. Potter, Benton, Potter & Murdock, P.C., Falls Church, VA.

Russell A. Shultis, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With him on the brief were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, Commercial Litigation Branch, and Kenneth M. Dintzer, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.  Of counsel were Gregory S. Walters and Gabriel G. Lopez, United States Department of Housing and Urban Development, Denver, CO.

## OPINION AND ORDER

LETTOW, Judge.

Post-judgment matters are at issue.  Earlier this year, judgment was entered in favor of plaintiff, Infiniti Information Systems ("Infiniti"), in this post-award bid protest of a contract to provide internet-related support services for the Department of Housing and Urban Development ("HUD").  The contract had been awarded to Ideogenics, LLC ("Ideogenics"), pursuant to Section 8(a) of the Small Business Act, 15 U.S.C. § 637(a).  In resolving Infiniti's challenge to the award to Ideogenics, the court found "HUD's evaluation and recommendation of Ideogenics to be contrary to law and arbitrary and capricious on two separate grounds."  *Infiniti Info. Solutions, LLC v. United States*, 92 Fed. Cl. 347, 359 (2010) ("*Infiniti I*").  First, the award contravened a regulation adopted by the Small Business Administration ("SBA"), barring a "non-competitive" award where potential awardees had received a statement of work and been evaluated based upon their responses.  Second, HUD had made the award to a non-Service-Disabled-Veteran-Owned ("SDVO") entity although it had indicated that the award would be

1

made to an SDVO entity.  *Id.* at 357-59.  Infiniti consequently was granted a declaratory judgment setting aside the award.  *Id.* at 359-60.  That judgment has become final.[1]

Having been awarded its costs of suit, *see Infiniti I*, 92 Fed. Cl. at 360, Infiniti has filed a Bill of Costs and concomitantly has moved for an award of attorneys' fees and expenses pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d).  Overall, Infiniti seeks $47,668.13 in attorneys' fees and expenses and $263.50 in costs.  Pl.'s Mot. at 4; Pl.'s Supp. Mot. at 2.[2]  The government resists such an award, arguing that it prevailed in part, but primarily maintaining that its position in the underlying litigation was substantially justified and secondarily questioning the reasonableness of Infiniti's attorneys' fee request.

## BACKGROUND[3]

HUD has used a contractor to provide internal and external website support services for its Office of Public and Indian Housing ("PIH").  *See Infiniti I*, 92 Fed. Cl. at 350.  Infiniti, an SDVO and African-American-owned company, performed these services from 2005 to September 19, 2009, under two sequential sole-source contracts issued pursuant to Section 8(a) of the Small Business Act.  *Id.*  The contested contract to Ideogenics was a replacement for Infiniti's earlier awards.

### A.  *Small Business Act Requirements*

Section 8(a) authorizes the Small Business Administration to enter into procurement contracts with other federal agencies and to subcontract performance of those contracts to disadvantaged small businesses.  *See* Pub. L. No. 85-536, 72 Stat. 384, 389-90 (1958) (codified as amended as 15 U.S.C. § 637(a)).  SBA's implementing regulations permit SBA to delegate the choice of subcontractor to the procuring agency ("procuring activity").  13 C.F.R. § 124.501(a).  A delegated procuring activity must in turn "report all 8(a) contract awards, modifications, and options to SBA."  *Id.*

A procuring activity must comply with the requirements of the Small Business Act and implementing regulations in carrying out its delegated authority.  Among other things, in a non-competitive procurement, it must not release a "statement of work for the requirement . . . to any of the Participants" being considered for a contract, although the procuring activity "[m]ay

---

[1] The government did not appeal, but it subsequently filed a motion for relief from final judgment under Rule 60(b)(6) of the Rules of the Court of Federal Claims ("RCFC"), which the court denied on July 29, 2010.  *Infiniti Info. Solutions, LLC v. United States*, __ Fed. Cl. __, 2010 WL 2983004 (2010) ("*Infiniti II*").

[2] In its initial application, Infiniti sought $34,835.63 in attorneys' fees and expenses plus $263.50 in costs.  A supplement filed September 8, 2010, requested an additional $12,747.50 in fees and $85.00 in expenses.  Pl.'s Supp. Mot. at 2.

[3] Only a general summary of the facts relevant to Infiniti's EAJA application is being provided.  The facts and circumstances of this action were addressed in greater detail in *Infiniti I*, 92 Fed. Cl. 347, and *Infiniti II*, __ Fed. Cl. __, 2010 WL 2983004.

conduct informal assessments of several Participants' capabilities to perform a specific requirement." 13 C.F.R. § 124.503(e)(2).  Further, the SBA cannot accept a procurement if limiting circumstances exist, described in 13 C.F.R. § 124.504, including where "[t]he procuring activity  . . . expressed a clear intent to reserve the procurement as a small business or small disadvantaged business ("SDB") set-aside prior to offering the requirement to SBA for an award as an 8(a) contract," 13 C.F.R. § 124.504(a), and where "[t]he procuring activity competed a requirement among Participants prior to offering the requirement to SBA and receiving SBA's formal acceptance of the requirement." 13 C.F.R. § 124.504(b).

### B.  *HUD's Procurement Activities*

By an agreement effective January 30, 2007, SBA delegated to HUD its authority to enter into prime contracts under Section 8(a) of the Small Business Act.  *Infiniti I*, 92 Fed. Cl. at 351. In the agreement between SBA and HUD, SBA "delegate[d] only the contract execution function," while remaining "the prime contractor on all 8(a) contracts."  *Id.* (quoting AR 9D-000356 (Partnership Agreement, ¶ IV.A.1)).[4]  In return, HUD bound itself to "adhere to all the provisions of contractual assistance identified in 13 C.F.R. parts 124.501 through 124.520, as well as the applicable provisions of [Federal Acquisition Regulations ("FAR")] 48 part 19."  *Id.* (quoting AR 9D-000358 (Partnership Agreement, ¶ IV.B.2)). The Agreement remained in effect until September 30, 2009.  *Id.* (citing AR 9D-000360 (ART. V)).

In May 2009, HUD issued a notice advising of a planned "PIH Internet/ HUD Web/ PHA Plan Support [Contract]."  *Infiniti I*, 92 Fed. Cl. at 351 (AR 3-000021 (May Forecast (May 18, 2009))).  This notice projected that the award would be a "Competitive 8(a) Set-Aside (Service Disabled/Veteran Owned)."  *Id.* (quoting AR 3-000022 (May Forecast)).  Several weeks later, HUD issued a revised notice for the same projected award, which differed from the prior notice only in listing the acquisition strategy as an "8(a) Direct (Service Disabled/Veteran Owned)."  *Id.* (quoting AR 3-000023 to 000024 (June Forecast (June 8, 2009))).[5]

On June 11, 2009, Susan Adams, Contract Oversight Specialist for HUD and PIH, e-mailed eleven vendors to schedule interviews with a panel comprised of herself and two other HUD employees, Reginald Strayhorn and Kevin Jones.  *Infiniti I*, 92 Fed. Cl. at 351-52.  The e-mails sent to the eleven vendors were virtually identical, and each began: "This e-mail

---

[4]"AR __" refers to the administrative record filed with this court in accord with RCFC 52.1(a). The administrative record has been subdivided into tabs.  The first number and, where applicable, letter in a citation to the administrative record refers to a particular tab, and the number after the hyphen refers to the particular page number of the administrative record, *e.g.*, "AR 5A-000026."  The pages of the administrative record are paginated sequentially without regard to the tabs.

[5]The notice dated June 8, 2009 did not state that the contract would be awarded on a sole-source basis.  Rather, by indicating that the award would be "direct," HUD meant that it would award the contract directly to a Section 8(a) firm, in accord with its delegation.  *See* United States Department of Housing and Urban Development, Office of the Chief Procurement Officer, Class Deviation to Federal Acquisition Regulation Subpart 19.8 and Part 52, Section 8(a) Awards, at 2 (Sept. 5, 2007).

confirms that [vendor company's name] will present its capabilities as they relate to the attached draft SOW." *Id.* at 352 (quoting AR 6B-000104 (E-mail from Ms. Adams to Ideogenics (June 11, 2009))). A draft "SOW," or statement of work, was attached to each e-mail. *Id.* at 352.

Several interviewees, as well as other firms who had expressed an interest in the procurement, posed queries to Ms. Adams regarding the acquisition strategy and process. *Infiniti I*, 92 Fed. Cl. at 352; *see, e.g.,* AR Supp. 16-000562 (E-mail from Ideogenics to Ms. Adams (May 27, 2009)) ("I understand that this is going to be an 8(a) direct award, correct?"); AR Supp. 17-000657 (E-mail from Jackie Robinson & Associates to Ms. Adams (June 22, 2009)) ("inquiring what the process was"); AR 7B-000124 (E-mail from Shiva Information Technology Services to Ms. Adams (June 22, 2009)) ("I am not clear about the procurement strategy listed as 8(a) direct [ ] and also Service Disabled/Veteran Owned. We are an 8(a) company but not SDVOB. Will we qualify for this procurement?"). In response to questions regarding whether SDVO was a requirement, Ms. Adams stated that SDVO was "just a preference." *Infiniti I*, 92 Fed. Cl. at 352 (quoting AR Supp. 16-000530 (E-mail from Ms. Adams to Imagine One Technology (Apr. 2, 2009))); *but see* AR Supp. 17-000626 (E-mail from Ms. Adams to Mr. Strayhorn (June 16, 2009)) (stating that an additional vendor was unlikely to be added for review because it was not a SDVO). Although Ms. Adams responded to inquiries about the acquisition strategy, she did not provide her answers to non-inquiring participants. *Infiniti I*, 92 Fed. Cl. at 359.

After interviewing potential vendors, including Infiniti, Ideogenics was recommended for the contract award. *Infiniti I*, 92 Fed. Cl. at 354. Ideogenics was not an SDVO entity. *Id.* at 353. HUD then sought SBA's authorization to negotiate a contract with Ideogenics, which SBA granted, and Ideogenics was awarded the contract. *Id.* at 354.

## C. *Challenges to the Procurement*

Infiniti filed a protest with the Government Accountability Office ("GAO") on August 27, 2009, claiming that HUD had awarded an "illegal sole source contract without affording Infiniti the protections and procedures set forth in the FAR supporting such anti-competitive awards." *Infiniti I*, 92 Fed. Cl. at 354 (quoting AR 12A-000414 to 000415 (GAO Protest)). Alternatively, Infiniti argued that "to the extent that the Comptroller General finds that the award to Ideogenics was done on a competitive basis, the award decision must be overturned because it was made on the basis of unstated evaluation criteria and not on the basis of a fair and reasonable evaluation." *Id.* (quoting AR 12A-000415 (GAO Protest)). HUD responded by moving for dismissal based upon lack of jurisdiction and Infiniti's failure to state legally sufficient grounds for the protest. *Id.* The administrative record of the procurement was never filed with GAO. Hr'g Tr. 20:5-14 (Sept. 3, 2010).[6]

On September 24, 2009, GAO dismissed the protest, concluding that "no solicitation was issued" because "there was neither a finalized statement of work [released to all the participants] nor a list of evaluation factors for award." *Infiniti I*, 92 Fed. Cl. at 354 (quoting AR 12F-000476

---

[6]The transcript of the hearing held on September 3, 2010 respecting Infiniti's EAJA application will subsequently be cited without a date.

(GAO Decision (Sept. 24, 2009))).  GAO considered the draft SOW that was provided to the eleven vendors prior to the interviews to be a "synopsis of the anticipated requirement" and viewed the information requested by HUD on each company's experience, key personnel, and other capability as falling within the ambit of permissible market research allowed by 13 C.F.R. § 124.503(e)(2).  *Infiniti I*, 92 Fed. Cl. at 354 (quoting AR 12F-000476 to 000477 (GAO Decision)).

Following the GAO's dismissal, Infiniti filed a complaint in this court on November 3, 2009.  Judgment was issued following the submission of cross-motions for judgment on the administrative record by Infiniti and the government.  The court found that "the document HUD e-mailed to the eleven vendors constituted a statement of work in contravention of SBA regulation 13 C.F.R. § 124.503(e)(2), making the award of the PIH contract to Ideogenics contrary to law."  *Infiniti I*, 92 Fed. Cl. at 359.  The final statement of work embodied in the contract with Ideogenics was identical to that transmitted to vendors as a "draft," excepting only several ministerial provisions.  *Id.* at 358-59.

The court further found that HUD's award to Ideogenics, a non-SDVO company, was made in contradiction to its published strategy for procurement.  *Infiniti I*, 92 Fed. Cl. at 359.  In both the May and June forecasts, HUD listed "Service Disabled/Veteran Owned" in parentheses beneath the acquisition strategy.  *Id.*  This listing created confusion, and when some of the vendors asked Ms. Adams about the requirement, she responded that SDVO was a "preference."  *Id.*  That SDVO was just a preference was not evident from the forecasts; instead, the forecasts suggested that SDVO was a mandatory qualification.  Infiniti and other entities who qualified as SDVOs had no conception that HUD would be considering non-SDVO firms.  The court thus found that HUD's actions with regard to the SDVO "preference" were arbitrary and capricious, and prejudicial to those vendors such as Infiniti who assumed, reasonably, that there was no ambiguity as to whether SDVO was a requirement.  *Id.*

Following the court's decision in favor of Infiniti, the government did not appeal.  In accordance with RCFC 62(a) and 6(d), the declaratory judgment setting aside the award to Ideogenics came into force on April 19, 2010.  At that time, the Ideogenics contract ceased to exist.  However, on June 2, 2010, the government filed a motion for relief from judgment under RCFC 60(b)(6), asking the court to allow Ideogenics to continue performing the contract until September 30, 2010.  Because the government failed to demonstrate the existence of "extraordinary circumstances" necessary to justify relief under RCFC 60(b)(6), the government's motion was denied.  *See Infiniti II*, __ Fed. Cl. at __, 2010 WL 2983004 at *5.

The proceedings on the government's motion for relief from judgment caused the court to harbor doubts that the government had honored the declaratory judgment setting aside the contractual award to Ideogenics.  Those doubts were confirmed at a hearing held on September 3, 2010, to address Infiniti's application for attorneys' fees and costs.  At that hearing, counsel for the government advised that "they [*i.e.*, HUD officials] haven't terminated the Ideogenics contract."  Hr'g Tr. 7:5.  Counsel explained that "it [HUD] was struggling in how to best implement the decision without causing disruption to HUD's system and carrying out their mission, and at the same time giving rise to unnecessary cost."  Hr'g Tr. 7:21-25.

Later that same day, the court issued an order instructing the government "to show cause why coercive injunctive relief should not issue to effectuate the [court's] declaratory judgment." Order to Show Cause (Sept. 3, 2010) (ECF No. 59). The government then responded that "HUD terminated the contract with Ideogenics on September 7, 2010." Def.'s Resp. to Order to Show Cause at 3 (ECF No. 60). Consequently, the judgment was finally implemented.

The post-judgment proceedings significantly increased the time Infiniti's counsel spent on the case.

## STANDARDS FOR DECISION

Under EAJA, an award of reasonable attorneys' fees may be made to a qualifying party who prevails in an action by or against the United States, provided that certain criteria are met. 28 U.S.C. § 2412(d)(1)(A). Eligibility for such an award requires that: (1) the claimant be a "prevailing party;" (2) the government's position was not "substantially justified;" (3) no "special circumstances make an award unjust;" and (4) any fee application be submitted to the court within 30 days of final judgment in the action and be supported by an itemized statement. 28 U.S.C. § 2412(d)(1)(A), (B); *see Commissioner, Immigration & Naturalization Serv. v. Jean*, 496 U.S. 154, 158 (1990); *Geo-Seis Helicopters, Inc. v. United States*, 79 Fed. Cl. 74, 76 (2007); *Loomis v. United States*, 74 Fed. Cl. 350, 353 (2006). In addition, if the party is a corporation, it must not have had more than $7,000,000 in net worth and five hundred employees at the time the adversarial adjudication was initiated. 28 U.S.C. § 2412(d)(2)(B); *see Dalles Irrigation Dist. v. United States*, 91 Fed. Cl. 689, 700-02 (2010); *Knowledge Connections, Inc. v. United States*, 76 Fed. Cl. 612, 614 (2007); *Lion Raisins, Inc. v. United States*, 57 Fed. Cl. 505, 508-12 (2003). Here, the government argues that its actions were substantially justified and that Infiniti was not a prevailing party for the phase of the litigation that concerned the government's motion for relief from the judgment.

## ANALYSIS

### A. *Prevailing Party Status*

To be a prevailing party, a plaintiff must be able to point to a resolution of its dispute which changes the legal relationship between itself and the defendant. *Texas State Teachers Assoc. v. Garland Independent Sch. Dist.*, 489 U.S. 782, 792 (1989) (citing *Hewitt v. Helms,* 482 U.S. 755, 760-61 (1987), and *Rhodes v. Stewart*, 488 U.S. 1, 3-4 (1988)). A declaratory judgment qualifies for this purpose if "it affects the behavior of the defendant toward the plaintiff," by, for example, terminating some conduct by the defendant. *Rhodes*, 488 U.S. at 4. In this context, as in many others, there "is little practical difference between injunctive and declaratory relief." *California v. Grace Brethren Church*, 457 U.S. 393, 408 (1982). Nonetheless, the government does not seem to accept or acknowledge this fundamental precept, and, instead, it acts as if the court had merely offered abstract observations that had no practical effect on its conduct. *See* Def.'s Resp. to Order to Show Cause at 1 ("Injunctive relief would not have been appropriate following the April 2, 2010 decision, . . . because . . . HUD's ability to perform its mission could have been adversely affected.").

6

The government does not contest Infiniti's prevailing-party status insofar as the declaratory judgment is concerned, but it does argue that Infiniti did not prevail against the government's motion for relief under RCFC 60(b)(6) and should be denied attorneys' fees for that portion of the litigation.  *See* Def.'s Opp'n to Pl.'s Supp. Mot ("Def.'s Supp. Opp.") at 6. ("[I]t is clear Infiniti is not the prevailing party because it did not obtain any affirmative relief from [the *Infiniti II*] decision.").  However, the underlying premise of this argument is mistaken. In the post-judgment proceedings, Infiniti had no reason to seek additional affirmative relief. The protested contract had been set aside and was no longer in existence.  At that point, Infiniti was endeavoring only to preserve the prior judgment from modification.

In pursuing this argument, the government markedly misstates the legal effect of the court's declaratory judgment.  The government argues that "the fact that the court characterized its [*Infiniti I*] decision as declaratory . . . meant HUD had not been required to terminate the Ideogenics contract" and concludes that, therefore, the government actually prevailed in its Rule 60(b)(6) motion, even though that motion was denied in *Infiniti II*.  Def.'s Supp. Opp'n at 7. This argument is wholly fallacious.  The declaratory judgment rendered in *Infiniti I* "set aside" the Ideogenics contract.  92 Fed. Cl. at 360.  The Ideogenics contract ceased to exist on April 19, 2010, and the government was required to terminate its relationship with Ideogenics on that date. *See Infiniti II*, __ Fed. Cl. at __, 2010 WL 2983004 at *3.  The court's decision in *Infiniti II*, denying the government's Rule 60(b)(6) motion, did not alter this result.

In short, Infiniti has been a prevailing party at every dispositive stage of this litigation, and the declaratory judgment in its favor engendered a "material alteration of the legal relationship" between Infiniti and the government.  *See Texas State Teachers Assoc.*, 489 U.S. at 792-93.  After the judgment set aside the Ideogenics contract, Infiniti and the government became eligible to enter into a contract for the services at issue.  The fact that the government did not then actually enter into a contract with Infiniti does not mean that Infiniti failed to prevail. The government's obdurate refusal to effectuate the court's judgment for almost five months, until September 7, 2010, *see* Order to Show Cause; Response to Order to Show Cause at 1, does not and cannot change the legal outcome of this case.

### B.  *Substantial Justification*

The burden of establishing substantial justification rests upon the government.  *See White v. Nicholson*, 412 F.3d 1314, 1315 (Fed. Cir. 2005); *Freedom, N.Y., Inc. v. United States*, 49 Fed. Cl. 713, 717 (2001).  The Supreme Court has described substantial justification as meaning "not 'justified to a high degree' but rather justified to the degree that would satisfy a reasonable person."  *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).  In determining substantial justification, the court must "look at the entirety of the government's conduct [both prior to and during litigation] and make a judgment call whether the government's overall position had a reasonable basis in both law and fact."  *Chiu v. United States*, 948 F.2d 711, 715 (Fed. Cir. 1991); *Bice v. United States*, 84 Fed. Cl. 173, 181 (2008); *Geo-Seis Helicopters*, 79 Fed. Cl. at 77; *see also Doty v. United States*, 71 F.3d 384, 386 (Fed. Cir. 1995) ("[T]he term 'position of the United States' [in EAJA] refers to the government's position throughout the dispute, including not only its litigating position but also the agency's administrative position.").  The key inquiry is "not what the law now is, but what the [g]overnment was substantially justified in

believing it to have been." *Loomis*, 74 Fed. Cl. at 355 (quoting *Pierce*, 487 U.S. at 561); *see also ACE Constructors, Inc. v. United States*, 81 Fed. Cl. 161, 165 (2008).

In contending that its actions were substantially justified, the government relies first on GAO's earlier dismissal of Infiniti's protest and second on the paucity of legal precedent concerning application of SBA's regulations, 13 C.F.R. § 124.503(e) and § 124.504. The government further argues that it was substantially justified in moving to be relieved from the final judgment under RCFC 60(b)(6). Each of these asserted grounds are unavailing.

1. *GAO's action.*

The government relies on GAO's dismissal of Infiniti's initial protest as evidence that its position was substantially justified. However, GAO's decision is not dispositive and must be considered in light of the government's overall position in the case. Particularly relevant in this respect are the regulatory provisions that pertained to the procurement and the circumstance that GAO reached its decision without testing factual assumptions necessary to its result. Several prior decisions, albeit non-judicial, had construed SBA's regulations in a manner fully consistent with the court's decision, but inconsistent with GAO's dismissal. Notably, given the actual facts of this protest, GAO's decision did not conform to its prior precedent in *Nomura Enter. Inc.*, 93-2 CPD ¶ 170, B-254581, 1993 WL 376467 (Comp. Gen. Sept. 15, 1993). In *Nomura*, a synopsis of the prospective contractual requirement had been published in the Commerce Business Daily, and GAO found that this disclosure amounted to "only a short outline of the agency's expected requirements." *Nomura*, 1993 WL 376467, at *2. GAO concluded that such an outline was not the same as a statement of work. *Id*. Before GAO in this case, a comparable legal question was raised, but on quite different facts.

Although GAO's decision acknowledged *Nomura*, citing it in its decision dismissing Infiniti's protest, GAO had no factual basis for that result. The administrative record had not been filed with GAO, and that body was acting purely on the basis of a motion to dismiss. No factual findings could have been made. Yet the GAO decision relied on an assumed factual predicate that HUD had merely conducted market research and had not circulated a statement of work to potential contractors. The administrative record shows that this factual assumption was wrong. In this procurement, as the government acknowledges, "people got lazy." Hr'g Tr. 5:19. The government conceded that "instead of . . . what *Nomura* says, doing a synopsis and rewording things, [the agency] just took the statement of work and cut pieces out of it, thinking that, well, it really [didn't matter]." Hr'g Tr. 5:19-23. In the circumstances, no credence can be given to GAO's decision, and that decision cannot serve as evidence that the government's actions in the procurement were substantially justified.

In *Geo-Seis*, 79 Fed. Cl. 74, the government similarly argued that, having previously prevailed before GAO, the court should deny plaintiff's EAJA motion because "the [g]overnment's defense of a case arising from an administrative decision is reasonable where it is not clear that the administrative decision was erroneous." *Id*. at 78 (internal citation omitted). The court in *Geo-Seis* rejected this argument, holding that the regulations governing the procurement, not GAO, "established the parameters for the Contracting Officer's action." *Id*. Here, as in *Geo-Seis*, the court looks directly to the language of the relevant regulations, 13

C.F.R. § 124.503(e) and § 124.504, to make its evaluation. Where "explicit, unambiguous regulations directly contradict" the government's position, that position "will not be found to be reasonable or substantially justified." *Geo-Seis*, 79 Fed. Cl. at 78 (citing *Hillensbeck v. United States*, 74 Fed. Cl. 477, 481 (2006)); *see also Filtration Dev. Co. v. United States*, 63 Fed. Cl. 612, 621 (2005) ("There is no justification for the government's position when clear, unambiguous regulations directly contradict that position."). SBA's regulations at issue are explicit and unambiguous when applied to the facts at hand, and therefore, regardless of GAO's opinion, the government's position before GAO and this court was not substantially justified.

    2.  *Legal precedent.*

    The government also argues that its position was substantially justified in light of the limited precedent available in determining whether release of the so-called "draft statement of work" to prospective contractors in a non-competitive procurement contravened 13 C.F.R. § 124.503(e)(2). *See Infiniti I*, 92 Fed. Cl. at 357. However, a relative dearth of precedent does not in itself substantially justify governmental action. *See Dalles Irrigation Dist.*, 91 Fed. Cl. at 698 ("The novelty of a legal issue does not by itself satisfy the government's burden of proof under EAJA.") (citing *Devine v. Sutermeister*, 733 F.2d 892, 895 (Fed. Cir. 1984), *superseded on other grounds by statute as recognized in Doty*, 71 F.3d at 385). The determination of a lack of substantial justification must be based on the entire record of proceedings and can be made even when the government's litigating position raises an issue of first impression. *See Gutierrez v. Barnhart*, 274 F.3d 1255, 1261 (9th Cir. 2001) ("[T]here is no per se rule that EAJA fees cannot be awarded where the government's litigation position contains an issue of first impression."); *United States v. Douglas*, 55 F.3d 584, 588-89 (11th Cir. 1995) (rejecting the government's contention that its position was substantially justified because it raised a question of first impression); *Dalles Irrigation Dist.*, 91 Fed. Cl. at 698 (same). Moreover, even if prior administrative decisions had supported the government's position, that position would not necessarily be reasonable. *See Geo-Seis*, 79 Fed. Cl. at 77-78 (holding the government's actions were not substantially justified despite numerous decisions by GAO supporting the government's position, where GAO's prior decisions were contrary to explicit regulations).

    Here, however, question of substantial justification is not so complicated. The limited prior existing precedent showed that the government's position was unfounded. Relevant protests consisted of the *Nomura* decision by GAO and two decisions by the General Services Administration Board of Contract Appeals, *Dynamic Decisions, Inc. v. Dept. of Health and Human Servs.*, 95-2 B.C.A. ¶ 27,732, GSBCA Nos. 13170-P & 13171-P, 1995 WL 314827, 1995 GSBCA LEXIS 167 (May 4, 1995), and *Electronic Sys. & Assocs., Inc. v. Dept. of the Air Force*, 93-1 B.C.A. ¶ 25,278, GSBCA No. 11833-P, 1992 WL 165562, 1992 GSBCA LEXIS 263 (July 15, 1992).[7]

    As discussed earlier, *Nomura* explains what kind of document *fails* to qualify as a statement of work. In *Nomura*, GAO decided that a particular synopsis which amounted to "only a short outline of the agency's expected requirements" was not the same as a statement of work. *Nomura*, 1993 WL 376467, at *2. Contrastingly, *Dynamic Decisions* and *Electronic Systems*

---

[7]Each of these cases was addressed in *Infiniti I*, 92 Fed. Cl. at 357-68.

held that when a statement of work is given to vendors prior to the time that a review is undertaken, the procurement must be competed.  *See Dynamic Decisions*, 1995 WL 314827, 1995 GSBCA LEXIS 167, at *46-*47 (sustaining a protest against the Public Health Service where the agency invited five companies to make oral presentations based on a statement of work and failed to inform SBA of its actions when recommending sole-source awards); *Electronic Sys.*, 1992 WL 165562, 1992 GSBCA LEXIS 263, at *14-*15 ("Whether the Air Force's review was considered to be either formal or informal, the procurement [should have been] competed because the statement of work had been given to vendors prior to the time that the review occurred.").  In this instance, HUD released a "draft," but its final contract with Ideogenics did "not differ in any material respect from the draft statement of work."  *Infiniti I*, 92 Fed. Cl. at 358.  HUD's use of the term "draft" cannot transform the reality of its action.

Because the government's actions were inappropriate in light of SBA's regulations and the available precedents, the court finds that the government has not met its burden of showing that its actions were substantially justified.

3. *Rule 60(b)(6) motion.*

Finally, the government argues that its motion for relief from judgment under Rule 60(b)(6) was substantially justified because "the relief [the government] sought was important for HUD, but did not prejudice Infiniti."  Def.'s Supp. Opp'n at 5.  This argument detracts from, rather than adds to, the government's posture in the case.

When determining whether the government was substantially justified, the court does not look to each phase of litigation and determine whether that portion was substantially justified, but rather considers "the government's position throughout the dispute."  *Doty*, 71 F.3d at 386.  As discussed above, the government's position, both in the procurement and in litigation, was not substantially justified.  But, even if the court were to consider the government's Rule 60(b)(6) motion in isolation, the government could not prevail even in part.  The government had failed either to appeal the court's decision in *Infiniti I* or to move for a stay of the court's final judgment entered upon that decision.  As the court explained in *Infiniti II*, "extraordinary circumstances" "beyond [the moving party's] control" must exist to justify relief under RCFC 60(b)(6).  *Infiniti II*, __, Fed. Cl. at __, 2010 WL 2983004 at *5 (quoting *Bank of Am., FSB v. United States*, 70 Fed.Cl. 246, 253 n.8 (2006)); *see also Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship,* 507 U.S. 380, 393 (1993) ("To justify relief under [Rule 60(b)(6)], a party must show 'extraordinary circumstances' suggesting that the party was faultless.").  In short, a Rule 60(b)(6) motion is only appropriate "where extraordinary circumstances prevented a party from taking timely action to prevent or correct an erroneous judgment."  *Infiniti II*, 2010 WL 2983004 at *5.  Nothing approaching "extraordinary circumstances" existed, and no justification even colorably existed for the government's Rule 60(b)(6) motion.  That motion came perilously close to being frivolous.

C.  *Attorneys' Fees and Expenses*

Infiniti requests $570.63 in expenses for electronic research costs, which the government does not contest.  *See* Pl.'s Mot. at 3; Pl.'s Supp. Mot. Ex. 1.  Infiniti also requests $47,097.50 in

attorneys' fees. Pl.'s Supp. Mot. at 3. The government objects to Infiniti's fee request on the grounds that (1) the hourly rate proposed by Infiniti is statutorily inappropriate and (2) the number of hours Infiniti's attorneys spent preparing for oral argument were excessive. Def.'s Opp'n at 6-8.

Under EAJA, a $125 per-hour cap applies to attorneys' fees "unless the court determines that an increase in the cost of living or a special factor, such as limited availability of qualified attorneys for the proceedings involved, justifies a higher fee." 28 U.S.C. § 2412(d)(2)(A)(ii). Infiniti seeks to recover fees at a rate of $325 per hour for attorneys Janine S. Benton, Kathy C. Potter, and James DelSordo and of $175 per hour for attorney Rosanne Stafiej, arguing that special factors are present that justify an award in excess of the statutory cap. Specifically, Infiniti argues that, "[d]ue to the complex nature of the procurement law at issue . . . , Infiniti required counsel with significant experience and knowledge of government contracts law." Pl.'s Mot. at 3. In the alternative, Infiniti requests that the court apply a cost of living adjustment ("COLA") to the EAJA maximum rate. *Id*. at 4.

    1.  *An enhanced award.*

In its opposition, the government argues that Infiniti's request for higher fees is not justified. *See* Def.'s Opp'n at 6-7. The court agrees. In *Pierce*, 487 U.S. 552, the Supreme Court stated that the exceptions to EAJA's cap on attorneys' fees "are not of broad and general application." *Id*. at 573. Thus, the "difficulty of issues" and "ability of counsel" do not qualify as special factors because they "are factors applicable to a broad spectrum of litigation; they are little more than routine reasons why market rates are what they are." *Id*. (internal quotations omitted). The EAJA exception for the "limited availability" factor must refer to attorneys "having some distinctive knowledge or specialized skill needful for the litigation in question — as opposed to an extraordinary level of the general lawyerly knowledge and ability useful in all litigation. Examples of the former would be an identifiable practice specialty such as patent law, or knowledge of a foreign law or language." *Id*. at 572. A government-contract case does not require the kind of specialized knowledge or skill that would justify an enhanced award. *See Prowest Diversified, Inc. v. United States*, 40 Fed. Cl. 879, 889 (1998); *see also Filtration Dev.*, 63 Fed. Cl. at 624 (describing an argument "alleging, without more, that government contract law was a specialty" as resting "on shaky ground"); *California Marine Cleaning, Inc. v. United States*, 43 Fed. Cl. 724, 732 (1999) (holding attorney's expertise and success in bid protests was an insufficient basis to exceed EAJA's statutory cap).

    2.  *COLA adjustment.*

Infiniti's proposed COLA adjustment, raising the hourly fee to $174.27, rests on a firmer footing. To receive an adjusted award, a plaintiff must "allege[] that the cost of living has increased [since the enactment of EAJA in March 1996], as measured by the Department of Labor's Consumer Price Index ('CPI')," *California Marine Cleaning*, 43 Fed. Cl. at 733, and supply the court with relevant CPI data. *See ACE Constructors*, 81 Fed. Cl. at 168; *Lion Raisins*, 57 Fed. Cl. at 519 (citing *Weaver-Bailey Contractors, Inc. v. United States*, 24 Cl. Ct. 576, 580-81 (1991)). Such an adjustment should be freely granted. *See Baker v. Bowen*, 839 F.2d 1075, 1084 (5th Cir. 1988) (stating that absent "unusual circumstances," a cost-of-living adjustment

should be granted in the EAJA attorneys' fees award); *see also Payne v. Sullivan*, 977 F.2d 900, 903 n.2 (4th Cir. 1992) (acknowledging that multiple circuits "regard the cost of living adjustment as 'essentially perfunctory or even mandatory'" (citation omitted)); *Former Employees of BMC Software, Inc. v. U.S. Sec'y of Labor*, 519 F.Supp.2d 1291, 1365 (C.I.T. 2007) ("[T]he great weight of authority today recognizes that '[i]t would undermine the purpose of EAJA to remove the financial disincentive to challenge wrongful government action if . . . courts could simply withhold an inflation adjustment without reason.'" (quoting *Payne*, 977 F.2d at 903 (internal quotation omitted))).

Using the CPI, Infiniti has calculated the change in the cost of living between March 1996 and November 2009, when this action was filed. This change raises the ceiling on attorneys' fees from $125 to $174.27. The court adopts this hourly rate for determining attorneys' fees in this case.

   3. *Attorneys' chargeable time.*

Infiniti initially requested fees for 105.5 hours of attorney time, Pl.'s Mot. Ex. 3, plus 48.5 hours of time spent on post-judgment proceedings. Pl.'s Supp. Mot. at Ex. 1. *See* Pl.'s Mot. Ex. 3. Of this time, 30.8 hours comprised preparation for and attendance at oral argument. *Id*. The government criticizes this time as excessive on two grounds. First, the government argues that 11.8 hours billed by attorneys Janine Benton and James DelSordo, neither of whom presented the oral argument, was excessive. *See* Def.'s Opp'n at 7. Second, the government argues that Ms. Benton and Mr. DelSordo's attendance at oral argument was unnecessary. *Id*. at 7-8.

Ms. Benton and Mr. DelSordo's attendance at oral argument was not *per se* unreasonable. *See, e.g.*, *Nelson v. Sullivan*, 776 F. Supp. 1265, 1268 (N.D. Ill. 1991). As Infiniti notes, the government also had multiple attorneys in attendance at oral argument. Pl.'s Reply at 8-9. However, the court finds the total amount of time spent in preparation for the oral argument was excessive in light of the issues presented and the total time expended on the case. Attorney Kathy Potter spent 15.8 hours preparing for oral argument, in addition to the 3.2 hours billed by Mr. DelSordo and 4.3 hours billed by Ms. Benton. The oral argument took place on March 16, 2010, but, prior to March 9, 2010, Ms. Potter had only billed 2.1 hours to Infiniti. The vast majority of work throughout the case had been undertaken by Ms. Benton and Mr. DelSordo, who were undoubtedly substantially more familiar with the matter than Ms. Potter was. The court infers that much of Ms. Potter's time in preparation for oral argument was spent becoming familiar with the facts and law of the case for the first time. Because no explanation was given for why Ms. Benton or Mr. DelSordo could not deliver the argument themselves, the court finds that half of the 23.3 hours spent in preparation for oral argument were not "reasonably expended." *See Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983).

The court awards attorneys fees for 142.4 hours of attorney time at a rate of $174.27 per hour, bringing the total fee to $24,816.05.

D.  *Bill of Costs*

Rule 54(d)(1) of the Rules of the Court of Federal Claims ("RCFC") provides in part that "[c]osts—other than attorneys' fees—should be allowed to the prevailing party to the extent permitted by [EAJA, 28 U.S.C. § 2412(a)(1)]."  The prevailing party has the obligation to provide documentation of the costs it requests.  *See Asphalt Supply & Serv., Inc. v. United States*, 75 Fed. Cl. 598, 602 (2007) (citing *Pan Am. Grain Mfg. Co. v. Puerto Rico Ports. Auth.*, 193 F.R.D. 26, 35 (D.P.R. 2000), *aff'd*, 295 F.3d 108 (1st Cir. 2002)).  Infiniti filed its Bill of Costs on July 1, 2010, requesting the costs of filing with the clerk's office and the cost of delivering its Complaint to Ideogenics.  *See* Pl.'s Mot. Ex. 4 (Bill of Costs).

EAJA explicitly allows a judgment for costs "as enumerated in [S]ection 1920 of this title." 28 U.S.C. § 2412(a)(1).  Under 28 U.S.C. § 1920(1), a judge or clerk of any court of the United States is allowed to tax as costs the "[f]ees of the clerk and marshal."  The amount that the clerk of this court may charge as the filing fee is governed by 28 U.S.C. § 1926, which provides that the fees are to be prescribed by the Judicial Conference of the United States.  At the time Infiniti filed its Complaint, the filing fee was set at $250.  Accordingly, Infiniti is awarded $250 as the cost of the filing fee paid on November 2, 2009.

Although not raised in the government's opposition, the court raises *sua sponte* the issue of whether Infiniti's delivery of its Complaint to Ideogenics via Federal Express on November 2, 2009, qualifies as a cost under Section 1920.  Some courts have awarded process-server fees pursuant to 28 U.S.C. § 1920(1), *see, e.g.*, *Alflex Corp. v. Underwriters Labs., Inc.*, 914 F.2d 175, 178 (9th Cir. 1990) (*per curiam*); *Tang How v. Edward J. Gerrits, Inc.*, 756 F. Supp. 1540, 1545 (S.D. Fla. 1991), *aff'd*, 961 F.2d 174 (11th Cir. 1992), but others have held that the plain language of the statute does not authorize the shifting of private process-server fees.  *See, e.g.*, *Crues v. KFC Corp.*, 768 F.2d 230, 234 (8th Cir. 1985); *see also Evergreen Pipeline Const. Co. v. Merritt Meridian Const. Co.*, 95 F.3d 153, 172 (2d Cir. 1996).  This split in authority should be resolved by reference to the text of Section 1920 because EAJA allows a judgment only for those costs "enumerated in [S]ection 1920 of this title."  Notably, Section 1920 contains no provision for the award of private process server or delivery fees.  *See Dalles Irrigation Dist.*, 91 Fed. Cl. at 711.  Thus, Infiniti is not awarded the delivery cost of $13.30.

## CONCLUSION

For the reasons set forth, Infiniti's application for attorneys' fees and expenses under EAJA is GRANTED IN PART.  Infiniti is also awarded a portion of its Bill of Costs.  Infiniti is awarded attorneys' fees in the amount of $24,816.05 plus costs and expenses totaling $820.63, consisting of $570.63 in electronic research expenses and $250 in clerk's fees.  The clerk shall enter judgment for Infiniti in the total amount of $25,636.68

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge